IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SAMMY R. SMITH,

        Plaintiff,

v.                                          CIV 14-0973 KBM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on Plaintiff's Motion to Reverse and

Remand for a Rehearing, with Supportive Memorandum (*Doc. 16*), filed June 11, 2015.

Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b), the parties

have consented to have me serve as the presiding judge and enter final judgment.

*Doc. 8*. Having reviewed the parties' submissions, the relevant law, and the relevant

portions of the Administrative Record, the Court finds that Plaintiff's motion is well-taken

and will be granted.

**I.    Procedural History**

On March 29, 2011, Plaintiff filed applications with the Social Security

Administration for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under Title II and XVI of the Social Security Act, with an alleged onset of

disability beginning October 26, 2008, from asthma, diabetes, hernia, bladder problems,

and back pain. *AR* at 149-162.[1] The agency denied Plaintiff's claims initially and upon

reconsideration, and Plaintiff requested a hearing. *Id.* at 83-91.

After a *de novo* hearing, Administrative Law Judge Myriam C. Fernandez Rice

("the ALJ") issued an unfavorable decision on May 3, 2013. *Id.* at 20-30. Plaintiff

submitted a Request for Review of the ALJ's Decision to the Appeals Council, which the

Council declined on August 29, 2014. *Id.* at 1-6.  As such, the ALJ's decision became

the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir.

2003).

A claimant seeking disability benefits must establish that he is unable "to engage

in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Commissioner must use a sequential

evaluation process to determine eligibility for benefits. 20 C.F.R. §§ 404.1520(a)(4) and

416.920(a)(4).

Here, at Step One of the sequential evaluation process, the ALJ found that

Plaintiff had not engaged in substantial gainful activity during the relevant time period.

*AR* at 22. At Step Two, she determined that Plaintiff had the severe impairments of

asthma, diabetes, hernia, urinary tract infections, obesity, depression, intermittent

explosive disorder, and chronic neck and back pain, most likely degenerative disc

disease. *Id.* At Step Three, she concluded that Plaintiff's impairments, individually and in

combination, did not meet or medically equal the regulatory "listings." *Id.* at 26. At Step

---

[1] Documents 12-1 through 12-13 comprise the sealed Administrative Record ("*AR*"). The Court cites the Record's internal pagination, rather than the CM/ECF document number and page.

Four, she assessed Plaintiff's residual functional capacity ("RFC"), finding an RFC that allowed Plaintiff to perform medium work except that he "must avoid even moderate exposure to extreme cold/heat, environmental irritants such as fumes, odors, dusts and gases or poorly ventilated areas and exposure to chemicals with occasional interaction with the public, but not precluding telephone communication." *Id.* at 27. Given this RFC, the ALJ determined that Plaintiff was unable to perform any of his past relevant work. *Id.* at 29. Nevertheless, at Step Five, the she determined that considering all of his impairments, there were jobs existing in significant numbers in the national economy that Plaintiff could perform. *Id.*

## II.   Legal Standard

The general inquiry is whether the ALJ applied the correct legal standards and whether her decision is supported by substantial evidence. *Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1161 (10th Cir. 2012). A deficiency in either area is grounds for remand. *Id.* Substantial evidence is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may not reweigh the evidence, substituting its own discretion for that of the Commissioner. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

## III.   Analysis

Plaintiff contends that the ALJ erred in two regards. First, he argues that she did not fully develop the record to clarify ambiguities surrounding the extent of Plaintiff's physical and mental limitations. *Doc. 16* at 16. Second, he maintains that the ALJ's RFC

finding was flawed because she failed to engage in the thorough function-by-function analysis required by SSR 96-8p in arriving at her decision. *Id.* at 22.

### A. Failure to Develop the Record Regarding Plaintiff's Neck and Back Impairments

On January 29, 2013, the same day as Plaintiff's hearing before the ALJ, Dr. Vigil performed a consultative evaluation of Plaintiff at the request of Plaintiff's attorney. *AR* at 453. Dr. Vigil noted Plaintiff's complaints of chronic neck, back, and lower right leg pain, as well as asthma, anxiety, and depression. *Id.* at 454. He also noted Plaintiff's reports of aggravation of pain when walking, bending, twisting, lifting, and performing other physical activities. *Id.* Plaintiff explained to Dr. Vigil that neither X-rays nor MRIs had been taken of his back or neck, because of his lack of insurance and inability to pay for such images. *Id.*

Plaintiff completed a Pain Disability Questionnaire during Dr. Vigil's examination, scoring 117 out of 150, which, according to Dr. Vigil, indicated "a severe problem with chronic pain." *Id.* at 455. Dr. Vigil also opined that Plaintiff exhibited "moderate and appropriate pain behavior during his examination." *Id.* at 456. More particularly, he observed that Plaintiff's gait was slow and antalgic,[2] favoring the right, that he was unable to walk on his toes or heels, and that he could not squat or hop. *Id.* at 457. Additionally, Dr. Vigil noted lower lumbar tenderness and decreased range of motion to flexion at about 60 degrees and extension to 0 degrees as well as lateral flexion to approximately 20 degrees bilaterally. *Id.* He found Plaintiff's straight leg lifting to be positive on the right in both the supine and sitting position. *Id.* His examination of Plaintiff's neck revealed midline and left paraspinal neck tenderness with spasm of the

---

[2] Similarly, he also noted that Plaintiff walked into the examination room "with a moderate limp favoring the right lower extremity." *AR* at 456.

paracervical muscles on the left. *Id.* Finally, he found Plaintiff's neck to have full but painful range of motion, especially with flexion and rotation to the right. *Id.* Dr. Vigil explained that Plaintiff "provid[e]d good and consistent effort and [he did] not suspect symptom magnification or malingering behavior." *Id.* at 456.

Dr. Vigil assessed Plaintiff with the following impairments:  chronic neck pain, most likely degenerative disc disease with radiculopathy; chronic low back pain, most likely degenerative disc disease with radiculopathy; chronic right lower extremity pain, most likely radicular pain, history of asthma, history of diabetes mellitus, depression and anxiety, umbilical hernia, and urethral stricture. *Id.* at 457. He went on to opine that Plaintiff has "severe functional limitations," and that his disabilities, including chronic pain, "preclude him from performing even sedentary work on a full-time and sustained basis." *Id.* at 457-458. Based upon his own evaluation of Plaintiff as well as his prior medical records, Dr. Vigil concluded that Plaintiff has "significant and substantial pain with even minimal activity as well as at rest and that he has significant problems with most aspects of daily living." *Id.* at 458.

Dr. Vigil also completed a medical assessment of Plaintiff's functional ability to do work-related activities. *Id.* at 460. Therein, he indicated that due to his chronic pain Plaintiff could only occasionally lift or carry less than five pounds, could only stand or walk for less than two hours in an eight-hour workday, could only sit for a total of less than four hours in an eight-hour workday, and was limited in his ability to push, pull and reach. *Id.* Dr. Vigil also found marked limitations in Plaintiff's ability to maintain physical effort for long periods of time and in his ability to complete a normal workday and

workweek without interruptions from pain or fatigue and without an unreasonable number and length of rest periods. *Id.* at 461.

In her May 3, 2013 decision, the ALJ concluded that Dr. Vigil's findings were "not consistent with the record as a whole." *Id.* at 24-25. Accordingly, she gave his opinion "no weight." *Id.* She explained that, aside from Dr. Vigil's report, Plaintiff was never "described as having a limp [or] requiring a cane" and there was "no evidence of nerve root compression; motor loss; muscle weakness; sensory and reflex loss or evidence of major dysfunction of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively." *Id.* at 25. The ALJ emphasized that there were "no x-rays or MRI to support [the] limitations" found by Dr. Vigil. *Id.* Finally, she noted that Plaintiff took only Aleve and Ibuprofen for his musculoskeletal pain. *Id.*

The Commissioner characterizes the ALJ's jusitifications as "good reasons" for rejecting Dr. Vigil's opinion. *Doc. 20* at 7. First, the Commissioner insists that the absence of X-rays or MRIs and Plaintiff's treatment of his pain with only over-the-counter medication[3] demonstrates that "Dr. Vigil's opinion was not supported by or consistent with the evidence of record." *Doc. 20* at 7.

Under 20 C.F.R. § 416.927, it is appropriate for an adjudicator to give more weight to an opinion supported by evidence, particularly medical signs and laboratory findings. § 416.927(c)(3). Conversely, an opinion not supported by medical signs and laboratory findings may be entitled to less weight. *See id.* Notably, however, a claimant's lack of financial means sometimes accounts for both the absence of medical signs and laboratory findings as well as for his or her reliance on over-the-counter medication. *See, e.g., Anderson v. Colvin*, No. 13cv108, 2014 WL 1255318, at *2, 7, 8

---

[3] Plaintiff reported to Dr. Vigil that he took Aleve 2-3 times per day for pain. *AR* at 455.

(D. Utah Mar. 26, 2014) (concluding that the ALJ failed to adequately develop the record regarding the claimant's degenerative disc disease of the cervical and lumbar spine by failing to obtain current CT, X-ray, or MRI images, where the claimant's financial limitations left him unable to afford diagnostic images or prescription pain medication).

Here, although Plaintiff sought treatment for neck, back, shoulder, and hip pain on only a handful of occasions, there is evidence to suggest that he failed to seek further medical treatment, or to have X-rays, MRIs, or EMGs taken, because he did not have insurance and could not otherwise afford medical treatment or diagnostic tests. *See, e.g., AR* at 454 (explaining to Dr. Vigil that he has not had X-rays, MRIs, or EMGs of his back or neck because he has no health insurance or other means to pay for such images); *id.* at 464 (reporting to Border Area Mental Health Services that he had "inadequate health care, lack of healthcare insurance, and the finances needed to pay for his medical expenses" and indicating that his financial situation has left him "struggling to care for his physical health concerns"); *id.* at 43, 47 (testifying at the administrative hearing that he could not afford to have a procedure to remediate his umbilical hernia or a recommended urological procedure because of his inability to afford these operations); *id.* at 47 (testifying at the administrative hearing that he was only able to be seen in medical facilities that do not require payment).  Given the apparent desperateness of Plaintiff's financial situation, as reflected in the records,[4] it

---

[4] For instance, Plaintiff reported to Border Area Mental Health Services in January 2013 that his "finances are a huge stress right now" and that he is "behind on child support and being threatened by the CSED to be put in jail and have [his] license revoked." *See AR* at 466. He also reported recently losing food stamps and borrowing money and selling personal items to support himself. *Id.* at 464.

follows that Plaintiff may have been reluctant to seek medical treatment or prescription medication for his neck and back pain, even if his limitations were as significant as Dr. Vigil found them to be, and even if he concurrently sought medical attention for seemingly urgent medical conditions such as chest pain.[5]  But "[a]n inability to pay for medical treatment provides a justifiable excuse for not pursuing medical treatment." *Anderson*, 2014 WL 1255318 at *8 (citing *Thompson v. Sullivan*, 987 F.2d 1482,1489-90 (10th Cir. 1993) and *Baker v. Bowen*, 886 F.2d 289, 292 (10th Cir. 1989).  As such, the mere absence of X-rays and MRIs or of indications that Plaintiff took prescription pain medication may not be a justifiable reason for rejecting the only examining physician's opinion regarding his functional limitations.

The Commissioner also maintains that certain subjective complaints reflected in Dr. Vigil's report did not appear elsewhere in Plaintiff's records.  *Doc. 20* at 7. Similarly, the ALJ explained that while Plaintiff reported back pain, there was "no evidence of any untoward degenerative changes or degenerative disc" and that while Plaintiff complained of left upper extremely pain, there were "no x-rays and/or findings of major dysfunction of his upper extremity resulting in an inability to lift/carry and/or perform fine and gross movements effectively." *AR* at 25. Additionally, although not mentioned by the ALJ, the Commissioner notes that when Plaintiff presented to the emergency room for chest pain in July 2012, just a few months before his appointment with Dr. Vigil, Plaintiff denied numbness, tingling, or weakness in his extremities.  *Doc. 20* at 7 (referencing *AR* at 333).

---

[5] The medical records reflect that Plaintiff presented to the emergency room at Mimbres Memorial Hospital on July 11, 2012, for chest pain. *AR* at 333.

Yet, given its own review of the record, the Court cannot say that Plaintiff's medical records are devoid of complaints or medical treatment for significant neck and back pain, which may be indicative of degenerative disc disease. On February 19, 2010, three years prior to Dr. Vigil's examination, Plaintiff sought medical treatment at Mimbres Memorial Hospital for pain in his neck, left shoulder and upper back, which he rated as an eight on a one-to-ten scale with ten being the "worst pain ever." *AR* at 242-245. At that time Plaintiff indicated that the onset of the pain for which he sought treatment was two to four days prior. *Id.* at 245. Internal Medicine Specialist Bassam Al-HJomsi, M.D., noted that Plaintiff's neck and shoulder pain radiated into his left arm with grinding in the joint, that he experienced some tingling in his fingers and in the front of his shoulder, and that his pain, which was a "constant ache," increased with cervical motion to the left. *Id.* at 247. Dr. Al-Homsi diagnosed Plaintiff with rotator cuff injury, tendonitis, and neck pain, instructed him to take Darvocet and Aleve for pain and Prednisone once a day, and to follow up with his doctor. *Id.* at 248.

A year and a half later, on July 5, 2011, and August 11, 2011, respectively, Plaintiff visited Ben Archer Health Center, seeking treatment for "left arm pain from shoulder down to hand" and "hip [and] neck pain [left] shoulder blade pain." *Id.* at 309, 311. Then, just prior to the hearing before the ALJ, in January 2013, Plaintiff reported to staff at Border Area Mental Health Services ("BAMHS"), that he was experiencing significant back pain, which radiated down his hip and leg. *AR* at 464, 471-472. He identified back pain as one reason, along with mental impairments, that he was not employed. *Id.* at 464. Although Plaintiff has by no means sought medical treatment for neck and back pain with regularity, the evidence suggests that, at minimum, such pain

has continued to plague him three years after his 2010 visit to Mimbres Memorial Hospital.

The ALJ provided another related ground for her rejection of Dr. Vigil's opinion: his previously-undocumented limp and use of a cane. The ALJ explicitly noted the absence elsewhere in the record of any indication that Plaintiff "had a limp [or] required a cane." *AR* at 25. Having examined Plaintiff's medical records, the Court notes that Plaintiff was reported to have a "normal gait" and to walk without assistance of a cane in February 2011. *AR* at 262, 271. It was two years later, in January 2013, that Dr. Vigil observed Plaintiff walking with a "moderate limp favoring the right lower extremity." *AR* at 456. At that time, Plaintiff reported to Dr. Vigil that his back pain had existed for many years but had become "progressively worse" and had become "disabling over the last few years." *Id.* at 454. That same day, Plaintiff testified at the hearing before the ALJ that he used a yucca branch to assist him when walking. *Id.* at 41. He indicated that while no doctor had ever recommended that he use a cane or walker, it made it easier for him to favor one leg. *Id.* Plaintiff did not testify as to precisely when he began using the yucca branch to assist his walking or as to when his limp developed. *See id.*

During the interim period between February 2011, when records indicate that Plaintiff had a "normal gait," and January 2013, when Dr. Vigil observed a limp, Plaintiff's medical records are silent as to his gait and ability to ambulate.[6] *See, e.g.*, *AR* at 309-33. In his April 18, 2011 Function Report, Plaintiff indicated that back pain and asthma affected his ability to walk, leaving him unable to walk more than 50 feet before

---

[6] Although Plaintiff protectively filed applications for DIB and SSI on March 15, 2011, the ALJ determined that he was not under a disability at any time from October 26, 2008, the date of alleged disability, through the date of her decision, May 3, 2013. *See AR* at 20, 30. As such, the extent of Plaintiff's limitations during the period from February 2011 to early 2013 is critical.

resting. *Id.* at 197. However, he did not mention walking with a limp. *See id.* at 192-199. Additionally, when he was specifically asked whether he used a cane, walker, brace, or crutches, Plaintiff made no indication that he used any such devices. *Id.* at 198. Around the same time, Plaintiff's friend, Charlie Clark, indicated in his Third-Party Function Report that Plaintiff's back pain affected his walking and other movements, but he too neglected to mention a limp or the use of a cane.  *Id.* at 41 and 207.

The development of a moderate limp between early 2011 and early 2013 is not necessarily inconsistent with Plaintiff's testimony or his subjective complaints to Dr. Vigil. Again, he reported to Dr. Vigil in early 2013 that that his back pain had "become disabling over the last few years," presumably referring to sometime between 2011 and 2013.  It is also conceivable that a moderate limp may not have been documented by medical personnel, even if it existed to some extent, when Plaintiff was treated in the emergency room in 2012 for chest pain.

In sum, the Court is not entirely satisfied that the ALJ's reasons for rejecting Dr. Vigil's opinion are legally sound or supported by substantial evidence in the record. Even so, examination of the ALJ's treatment of Dr. Vigil's opinion reveals a more fundamental failure by the ALJ. While the Commissioner attempts to characterize the ALJ's treatment of Dr. Vigil's opinion as appropriate and in accordance with 20 C.F.R. § 416.927, Plaintiff's position is more nuanced.  He takes issue not with the weighing of Dr. Vigil's opinion but with the ALJ's failure to develop the record concerning limitations identified by Dr. Vigil, particularly through a consultative physical examination to include MRIs or X-rays. *Doc. 21* at 4.

Although the Commissioner generally has broad latitude in ordering consultative examinations, *Hawkins v. Chater*, 113 F.3d 1162 ,1166 (10th Cir. 1997), the regulations suggest that it may be appropriate to purchase such an examination when the evidence as a whole is insufficient to allow the adjudicator to make a determination or decision on a disability claim.  20 C.F.R. § 404.1519a(b). For example, a consultative examination may be required "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," including "[h]ighly technical or specialized medical evidence . . . not available from your treating or other medical sources." 20 C.F.R. § 404.1519a(b)(3). Moreover, the Tenth Circuit has reasoned that an ALJ "should order a consultative exam when evidence in the record establishes a *reasonable possibility* of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability." *Madrid v. Barnhart*, 447 F.3d 788 (10th Cir. 2006) (emphasis in original). When considering whether a consultative examination should be ordered, "the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

Here, the ALJ was aware of the reasonable possibility that Plaintiff suffered from chronic pain in his back, neck and leg based upon records from Mimbres Memorial Hospital and Ben Archer Health Center, Dr. Vigil's report, the Third-Party Function Report of Mr. Clark, and Plaintiff's own testimony. *AR* at 40-51, 239-80, 215-407, 457. Indeed, she included "chronic neck and back pain, most likely degenerative disc disease" as a severe impairment at Step Two of her analysis. *Id.* at *22*. The question

remains, though, whether the result of a consultative exam, to include X-rays, an MRI, or the like, would have reasonably been expected to be of material assistance in resolving the issue of Plaintiff's disability.

Because Plaintiff's counsel did not specifically request an additional consultative physical examination and/or X-rays or MRIs of his neck or back at the administrative stage, he shoulders a heavy burden in demonstrating a failure by the ALJ to develop the record. After all, "in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Hawkins*, 113 F.3d at 1167.  This is not to say that a claimant can never establish a failure to develop in a counseled case, however.  *See, e.g., Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (remanding for a consultative examination on the question of RFC, even though the claimant was represented by an attorney, who interviewed her at the hearing before the ALJ). Indeed, even if counsel neglects to request development of a particular issue, courts may still impose on an ALJ the duty to order a consultative examination "if the need for one is clearly established by the record." *See Hawkins*, 113 F.3d at 1168.

Thus, the fact of Plaintiff's representation below did not necessarily extinguish the need for proper development of the record regarding his back and neck impairments. Moreover, although Plaintiff's counsel failed to affirmatively request further development of Plaintiff's neck and back impairments through X-rays or an MRI, the Court questions whether the ALJ's wholesale rejection of Dr. Vigil's opinion, which was premised upon the absence of such diagnostic images, would have been foreseeable to counsel.

As to whether the need for a consultative examination was "clearly established by the record," *Baker v. Bowen*, 886 F.2d 289 (10th Cir. 1989) is instructive, even though claimant there was unrepresented at the administrative stage.  In *Baker*, the Tenth Circuit reversed and remanded the ALJ's determination that there was no definitive evidence that the claimant was suffering from a disabling impairment, holding that the ALJ "failed its burden to fully and fairly develop the record" and erroneously relied upon the "dearth of objective medical evidence to support the denial of benefits." *Id.* at 291-92. The Tenth Circuit suggested that the ALJ, when ordering a consultative physical examination, should have specifically requested recent X-rays of the claimant's spine. *Id.* at 291. It noted that the claimant, in addition to being unrepresented, was also unable to secure records and X-rays from her treating physician, unable to afford new x-rays, and complained "primarily of pain and stiffness due to arthritis, a disease commonly confirmed by x-rays." *Id.* at 291-92.

While Plaintiff here *was* represented by counsel, there is, as in *Baker*, evidence to suggest that X-rays and MRIs were not been taken because of Plaintiff's lack of medical insurance and inability to afford such diagnostic images.  Moreover, degenerative disc disease, which Dr. Vigil and the ALJ both indicated was the likely cause of Plaintiff's neck and back pain, is a disease commonly diagnosed or confirmed through diagnostic testing, such as CT, X-ray, or MRI scan. *See Anderson v. Colvin*, 2014 WL 1255318 (D. Utah Mar. 26, 2014) (concluding that without acquiring current images, through CT, X-ray, or MRI, the ALJ did not have adequate information to determine whether the claimant's degenerative disc disease of the cervical and lumbar spine was sufficiently severe to meet or medically equal the severity of the

corresponding Listing). The import of such images is also evidenced by the fact that the ALJ, Dr. Vigil, and the Commissioner each noted their absence, the ALJ specifically relying upon the absence of such images to reject limitations found by Dr. Vigil and to question the credibility of Plaintiff's subjective complaints. *See AR* at 25.

Although the record contains no X-rays or MRIs of Plaintiff's neck or back, it does contain other objective medical findings suggesting a "reasonable possibility" of the existence of disabling neck and/or back condition. For instance, in 2010 Dr. Bassam assessed Plaintiff with left neck and should pain that radiated into the left arm with "grinding at the joint." *Id.* at 247.  More recently, Dr. Vigil found Plaintiff to have a "slow and antalgic" gait, an inability to walk on toes or heels, an inability to squat or hop, lower lumbar tenderness and decreased range of motion, positive straight leg test in both the supine and sitting position, and neck tenderness with spasm. *Id.* at 456-57.  Finally, the results of Plaintiff's Pain Disability Questionnaire indicated a severe problem with chronic pain. *Id.* at 455.

In the Court's view, a current X-ray, CT, or MRI of Plaintiff's back and neck, along with a consultative examiner's analysis of the appropriate images, is crucial to a proper evaluation of the severity of Plaintiff's probable degenerative disc disease and to a proper assessment of his functional limitations. Unfortunately, the ALJ failed in her burden of fully and fairly developing the record, and her reliance on the absence of diagnostic images to support the denial of benefits was, under the circumstances, erroneous. It could be said that the ALJ essentially penalized Plaintiff for his failure to provide MRIs and X-rays that he could not afford.

**B.  Failure to Develop the Record Regarding Plaintiff's Mental Impairments**

Plaintiff makes a similar argument with respect to the ALJ's failure to obtain a consultative psychological examination. Although Plaintiff did not list any mental impairments at the time of his initial application, he reported struggling with depression and anger at the time of the hearing before the ALJ. *AR* at 24, 44. Noting that no consultative psychological examination had been provided, Plaintiff's attorney requested during the hearing that one be scheduled if the ALJ had "issues about the claimant's mental impairment." *Id.* at 51. The ALJ stated, "Okay, I'm going to wait for those additional medical records [from BAMHS] to come in, Mr. Armstrong. If after reviewing those I believe that a psychological consultative exam is necessary, at that point I'll send out notice for that, okay?" *Id.* at 58. Then, after the hearing, Plaintiff's attorney requested, this time in writing, that the ALJ "request a consultative psychological evaluation to ascertain the extent and severity of [Plaintiff's] anxiety and depression." *Id.* at 462. Emphasizing that Plaintiff's medical records documented a diagnosis of delusional disorder as well as depression and anxiety, Plaintiff's counsel expressed his position that the evidence of record established a "reasonable possibility" of disabling mental impairments. *Id.* No consultative psychological exam was ever ordered by the ALJ.

Nevertheless, the Commissioner insists that the ALJ had sufficient evidence to assess Plaintiff's mental impairments. *Doc. 20* at 9. Plaintiff, on the other hand, maintains that this is "precisely the kind of case in which a consultative evaluation by a psychologist was required." *Doc. 21* at 5 (citing *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)). Acknowledging the ALJ's statement that "[n]o treating doctor has

opined that the claimant is unable to work," Plaintiff insists that "the record is entirely devoid of opinions as to [his] ability to work from any treating or examining physicians aside from a consultative examination by Dr. Vigil, which was requested by counsel for [Plaintiff]." *Doc. 16* at 19.

As with Plaintiff's physical impairments, the ALJ was responsible to ensure that an adequate record was developed consistent with the mental impairment issues raised. *Hawkins*, 113 F.3d at 1168. The Commissioner was also required by statute to make "*every reasonable effort* to ensure that a qualified psychiatrist or psychologist . . . completed the medical portion of the case review and any applicable residual functional capacity assessment." 42 U.S.C. § 421(h) (emphasis added).

The evidence of Plaintiff's mental impairments was as follows:

In his Functional Report, Plaintiff noted limitations in his memory, concentration, task completion and ability to get along with others. *AR* at 197. He indicated that he has difficulty getting along with authority figures and lives alone "cause [he] can't deal with anyone on a day to day, constant, basis." *Id.* at 197-98. He reported having few friends and indicated that although he had not been diagnosed, he thinks he sometimes suffers from anxiety attacks. *Id.*

Plaintiff's neighbor, Terry Lewis, observed in a third-party statement that Plaintiff is depressed and that he "can see the sadness on a lot of days." *Id.* at 238. Mr. Lewis indicated that Plaintiff's depression makes it difficult for him to concentrate. *Id.* He also suggested that Plaintiff's "frustration and anger would cause conflicts with coworkers and supervisors." *Id.*

Records submitted from BAMHS indicated that Plaintiff presented there for a mental health evaluation and treatment on October 13, 2011. *Id.* at 409-16. Licensed Master Social Worker ("LMSW") Kristine Drake conducted an intake assessment and initial treatment plan for Plaintiff. *Id.* She diagnosed him with impulse-control disorder, noting that he "met two out of three [criteria] needed for Intermittend [sic] Explosive Disorder." *Id.* at 409. She also concluded that he had a Global Assessment of Functioning ("GAF") score of 53, and she recommended that he begin regular one-on-one therapy to address issues of anger control and management. *Id.*

Plaintiff continued to see LMSW Drake through March of 2012. Then, he stopped attending treatment sessions and, in September of 2012, advised staff at BAMH that he was feeling well and did not require their services. *Id.* at 421. At the hearing before the ALJ, Plaintiff explained that he stopped attending these treatment sessions because when he showed up for appointments, his therapist "wouldn't be there . . . [a]nd it seemed to me like she just didn't care." *Id.* at 51; *see also id.* at 467 (Plaintiff reporting to BAMHS that during his treatment at BAMHS in 2011 he "didn't feel that he was getting attention since his therapist was always sick").

The following year, on January 15, 2013, Plaintiff returned to BAMHS and was given an additional diagnostic assessment, this time by Licensed Marriage and Family Therapist ("LMFT") Cindy Goggin. *AR* 463-72. LMFT Goggin added a diagnosis of delusional disorder to the previous diagnoses on the basis that Plaintiff reported feelings that "people are watching him and talking about him" and "plot[ting] against him." *Id.* at 463. According to LMFT Goggin, Plaintiff reported thinking that "people [were] casing his house or trying to get him in trouble, or ruining his relationships with others." *Id.* at

467. Plaintiff also told LMFT Goggin that he "can't trust his family because they all try to cheat me." *Id.* at 464.

LMFT Goggin concluded that Plaintiff's GAF score had dropped to 43, *id.* at 465, which indicates serious symptoms or serious impairment in social, occupational, or school functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000). She found Plaintiff to be delusional with limited insight and judgment and indicated a plan to "rule out Schizophrenia as there is a strong family hx for the illness and [Plaintiff] demonstrates some of the symptoms."[7] *Id.* at 463, 466-67.  Plaintiff's treatment plan provided for psychotherapy every two weeks in an effort to decrease his anger and paranoia and for him to work with a CNS/psychiatrist to identify medications to help him manage anger and reduce the severity of his paranoia. *Id.* at 473-74. This is where Plaintiff's records at BAMHS end.

Then, Plaintiff reported to Dr. Vigil at his January 29, 2013 examination, that he experienced "depression and anxiety secondary to his chronic medical problems and inability to work." *Id.* at 455. He indicated that his anxiety caused concentration and memory difficulties, and he told Dr. Vigil that he was in a "low mood most of the time." *Id.* Dr. Vigil diagnosed Plaintiff with depression and anxiety. *Id.* at 457. That same day, Plaintiff testified at the hearing before the ALJ that he has a "tough time dealing with anger" and that "a lot of it . . . stems from the depression." *AR* at 44. The ALJ inquired no further.

An ALJ is only expected to order a consultative psychological exam if the evidence demonstrates a "reasonable possibility" of a disability and such an exam could

---

[7] LMFT Goggin recorded that Plaintiff's sister, who lives on the streets, has Schizophrenia and that his cousins and niece have the same characteristics. *AR* at 469-70.

reasonably be expected to be of material assistance in resolving the issue of disability. *See Madrid v. Barnhart*, 447 F.3d 788 (10th Cir. 2006). Here, the treatment records from BAMHS, coupled with Dr. Vigil's assessment and the function reports of Plaintiff and Mr. Lewis, suggests that Plaintiff suffered from depression and anxiety since at least October 2011, and that these issues had either not resolved or had reemerged in January 2013.  There is also a reference in the record to Plaintiff previously obtaining a prescription for Zoloft to treat his depression, though there is no evidence as to its effectiveness. *See AR* at 467. The Court finds that further development of the record is required regarding the severity and responsiveness to medication of Plaintiff's depression and anxiety.

Likewise, Plaintiff's more recent diagnosis of "delusional disorder" requires further explanation and perhaps additional testing. *See Hawkins*, 113 F.3d at 1166 (stating that where additional tests are required to explain a diagnosis already contained in the record or whether the medical evidence in the record is inconclusive, resort to a consultative examination may be necessary). Indeed, Plaintiff's mental health records appear somewhat inconclusive regarding his delusions and possible symptoms of schizophrenia. *See AR* at 463, 466-67 (LMFT Goggin finding Plaintiff to be delusional with limited insight and judgment and indicating her plan to "rule out Schizophrenia as there is a strong family hx for the illness and [Plaintiff] demonstrates some of the symptoms").

The Commissioner argues that the ALJ had sufficient evidence upon which to base her findings regarding Plaintiff's mental functioning "[c]onsidering Plaintiff's non-compliance with treatment" and the "absence of significant treatment" *Doc.* 20 at 9. The

ALJ's decision does seem to imply that Plaintiff's failure to keep appointments with BAMHS undermines the severity of his mental impairments.  *See AR* at 24 (noting that "Again, the claimant failed to make follow up visits [with BAMHS]."). But when a claimant discontinues treatment for legitimate reasons, that discontinuity in treatment alone does not constitute substantial evidence that the condition is not disabling.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (reasoning that before the ALJ may rely upon the claimant's failure to pursue treatment or take medication, he or she should consider, among other factors, whether the failure to pursue treatment was "without justifiable excuse"); *Sutterfield v. Chater*, 99 F.3d 1150, at *2 (10th Cir. 1996) (unpublished) (concluding that where the claimant testified that he discontinued treatment for financial reasons, there was not substantial evidence to support the conclusion that he could perform sedentary work).  Here, the ALJ's decision gives no indication that she gave adequate consideration to the justifications articulated by Plaintiff for his sporadic cooperation with mental health treatment at BAMHS.  Moreover, the ALJ did not inquire at the hearing whether BAMHS was one of the medical providers mentioned by Plaintiff that required payment at the time of treatment. *See id.* at 47.

In sum, given the available evidence of Plaintiff's mental impairments, as well as his explanation for discontinuing treatment with BAMHS, the Court finds sufficient evidence of record to suggest the existence of mental impairments which may have a material impact on the disability decision.  As a result, the ALJ should have developed the record to ascertain whether these mental impairments limited Plaintiff's ability to work or the range of jobs that were available to him. As with Plaintiff's neck and back

impairments, the ALJ should have ordered a consultative examination. *See Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996).

### C.  RFC Failure

Plaintiff also contends that the ALJ erred in her RFC assessment by failing to adequately describe how Plaintiff's asthma, obesity, pain, anger, and depression affect his ability to conduct sustained work activities as required by SSR 96-8p. Having concluded that remand for further development of the record is required, the Court will not address this alleged error, as the RFC assessment may be affected by the ALJ's treatment of the case on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV. Conclusion

For the foregoing reasons, the Court will remand for further development of the record concerning Plaintiff's neck and back impairments as well as his mental impairments.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion to remand *(Doc. 16)* is **granted**.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by Consent